UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 95-605-CR-SEITZ

UNITED STATES OF AMERICA,

v.

FRANCISCO SALDANA,

    Defendant.
_____/

**UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION TO SALDANA'S MEMORANDUM OF LAW OF ADDITIONAL BASIS IN SUPPORT OF COMPASSIONATE RELEASE**

The United States of America, by and through the undersigned Assistant United States Attorney, hereby responds in opposition to Saldana's Memorandum of Law of Additional Basis in Support of Compassionate Release (Motion) (CRDE 1394).[1] The Defendant seeks release from incarceration based upon "extraordinary and compelling reasons," namely his medical conditions, coupled with the ongoing COVID-19 pandemic and his allegations that he has suffered a tremendous sentencing disparity which this court should rectify. For the reasons set forth below, this Court should deny the Defendant's motion.

**FACTUAL AND PROCEDURAL BACKGROUND**

In May of 1996, a jury in the Southern District of Florida convicted Francisco Saldana of conspiracy to possess with the intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846 (Count 1); possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1)

---

[1] The government will refer to documents in the underlying criminal case as "CRDE," followed by the appropriate docket entry number and the corresponding page number assigned by the electronic docketing system.

(Counts 4, 12, 13, 15, 18); use of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Counts 7, 19); possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Counts 5, 20); and engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848 (Count 21) (CRDE 185 (indictment); CRDE 360 (verdict)). The jury acquitted him of one of the § 924(c) counts (*id.*).

The Probation Office prepared a Pre-Sentence Investigation Report (PSI) to aid the district court at sentencing. According to the undisputed facts in the PSI, Saldana and his brother, Jose Saldana, ran a violent crack cocaine distribution organization that operated primarily out of a residence in Miami, Florida (PSI ¶ 11). From 1988 until August 1995, the organization distributed multi-kilogram amounts of cocaine, mostly in the form of crack cocaine, on a weekly basis (PSI ¶ 12). "Francisco Saldana was involved in the conspiracy and the organization from its inception. Saldana and his organization trafficked in approximately two to five kilograms of crack cocaine on a weekly basis" (PSI ¶ 15). "Francisco Saldana was the head of the entire organization. During the span of time that the gang was in existence, Francisco Saldana supervised in excess of twenty different individuals . . . and was responsible for numerous acts of violence, including shootings, assaults and murder" (PSI ¶ 16). As the leader of the organization, Saldana "was responsible for all facets of the organization, which included but was not limited to purchasing cocaine powder, converting the cocaine into crack cocaine, recruiting and supervising the different gang members, money collection, and cocaine distribution" (PSI ¶ 33). Applying the 1995 Sentencing Guidelines, the PSI determined that Saldana's total offense level was 42, his criminal history category was IV[2], and his guidelines imprisonment range was 360 months to life (PSI ¶ 112). However, counts

---

[2]   Per the PSI, the defendant has the following arrests and convictions: July 16, 1985 arrest for aiding escape, charges reduced to resisting arrest without violence and he received credit for time served; August 7, 1985 arrest and conviction for grand theft auto, received 30 months'

1, 4, 12, and 15 carried a mandatory term of life imprisonment, pursuant to 21 U.S.C. §§841(b)(1)(A), 846 and 851 (PSI ¶ 109). Therefore, because the statutorily required minimum sentence was greater than the minimum of the guideline imprisonment range, Saldana's guidelines range became life, pursuant to USSG §5G1.1(c)(2) (PSI ¶ 112).

On July 26, 1996, the district court sentenced Saldana to four concurrent terms of life imprisonment as to Counts 1, 4, 12, and 15; four concurrent terms of 10 years in prison as to Counts 5, 13, 18, and 20; a consecutive term of 5 years as to Count 7; and a consecutive term of 10 years (for a total of life plus fifteen years). Prior to trial, the government filed a "Notice of Intent to Seek Enhanced Penalties Due to Prior Convictions," pursuant to 21 U.S.C. §§841(b)(1)(A) and 851 (CRDE 286). The Government sought an enhanced sentence based on Saldana's prior Florida convictions for possession of cocaine and sale of cocaine (*id.*) as to Count 19 (CRDE 473

---

probation, $ 2,300 restitution and court costs (January 27, 1986 revocation of probation for new arrest of burglary of a structure and petit theft, received 364 days incarceration in county jail and imposition of conviction on original charge); November 11, 1985 arrest and conviction for burglary of a structure and petit theft, received 364 days imprisonment concurrent with the above resisting arrest revocation; February 28, 1990 arrests for forgery and obstruction of justice, received two days credit for time served; June 16, 1990 arrest for possession of cocaine, received 3 days county jail credit for time served and court costs; July 18, 1991, obstruction on a police officer, received credit for time served. The defendant has the following arrests for other criminal conduct: March 6, 1983 arrest for burglary of a structure; August 8, 1984 arrest for loitering and prowling; December 29, 1984 arrest for burglary of a conveyance; September 16, 1987 arrest for loitering and prowling; February 14, 1988 arrest for aggravated assault; June 1, 1989 arrest for attempted murder; July 23, 1990 dumping of trash on the street; June 12, 1991 arrest for aggravated assault; February 29, 1992 arrest for carrying a concealed firearm; March 9, 1992 arrest for possession of marijuana; April 26, 1992 arrest for aggravated assault; May 26, 1992 arrest for obstruction of a police officer (failed to appear in court and a bench warrant issued); March 28, 1993 arrest for aggravated assault with a firearm, aggravated assault on a pregnant woman, aggravated domestic violence and possession of a firearm by a convicted felon; October 8, 1993 arrest for possession of contraband (cocaine and marijuana) in a closed facility (a Dade County correction facility cell), possession of drug paraphernalia and battery on an intake officer; October 26, 1994 arrest for trespass of a conveyance; and May 3, 1995 disobeying a lawful order. The PSI also reflects the following cases pending at the time of his arrest for the instant underlying criminal conduct and case: April 10, 1995 arrest for obstruction of justice; and September 11, 1995 arrest for battery and disorderly conduct.

judgment); (CRDE 536 amended judgment); (CRDE 569 sentencing transcript). Saldana appealed, and challenged his convictions and sentences on numerous grounds. The Court of Appeals affirmed Saldana's conviction and sentence in Eleventh Circuit Case No. 96- 4993 (CRDE 660). Saldana later filed a *pro se* motion to reduce his sentence, pursuant to 18 U.S.C. § 3582(c) (CRDE 795), which this Court denied, finding that he was not eligible for the relief provided by the retroactive application of Amendment 782 "because he would still be bound by the statutorily required sentence of life imprisonment" (CRDE 832). The Court of Appeals affirmed in Appeal No. 08-16571 and 09-11167 (CRDE 997). Germaine to this motion, on April 29, 2019, the Defendant moved this Court for compassionate release pursuant to Section 404(a) of the First Step Act (CRDE1269, 1274), which Motion the Government opposed (CRDE 1271). The defendant filed a series of *pro se* motions, prompting the court to instruct the defendant that he was represented by counsel and to refrain from *pro se* filings (CRDE 1282, 1284). As detailed below, the district court denied Saldana's motions' to reduce his sentence pursuant to Section 404 of the First Step Act on November 25, 2020 (CRDE 1349).

On November 30, 2020, Saldana, through counsel, filed a Notice of Appeal of the denial of his Section 404 motion to reduce sentence (CRDE 1353) which was docketed as Eleventh Circuit Case No. 20-14490 on December 2, 2020 (CRDE 1354). Despite that notice, on January 5, 2021, Saldana filed a *pro se* motion for reconsideration of the denial of his Section 404 motion for sentence reduction (CRDE 1372). This appeal is pending before the Eleventh Circuit. Based upon the pending appeal of the district court's denial of Saldana' motion to reduce his sentence pursuant to Section 404 of the First Step Act (CRDE 1357), the district court issued an order on February 12, 2021, advising that the court lacks jurisdiction to consider the merits of both Saldana's motion for immediate release based on extraordinary and compelling reasons pursuant

to Section 603 of the First Step Act (CRDE 1348), his motion for reconsideration of the order denying his motion to reduce his sentence pursuant to Section 404 of the First Step Act (CRDE 1376) and his supplemental motion filed on March 15, 2021 (CRDE 1394).[3]

Meanwhile, in March 2020, Saldana also filed a counseled motion and reply seeking immediate release based upon the health risks arising from the Coronavirus Disease ("COVID-19") (CRDE 1319; CRDE 1322) which the government opposed (CRDE 1321). Saldana then filed another motion for compassionate release and additional pleadings in support of his motion (CRDE 1329; CRDE 1334, CRDE 1341, CRDE 1344-5, CRDE 1347). The government again opposed the motion for release (CRDE 1332). The district court held two telephonic hearings (CRDE 1340; CRDE 1343) and then denied the motion for compassionate release pursuant to Section 603 of the First Step Act on November 25, 2020 (CRDE 1350).

On December 9, 2020, Saldana, through counsel, filed a Notice of Appeal of the denial of his Section 603 motion to reduce sentence (CRDE 1361) which was docketed as Eleventh Circuit Case No. 20-14632 on December 10, 2020 (CRDE 1363). On December 10, 2020, the defendant filed a motion to reconsider the court's denial of his compassionate release request (CRDE 1362). He then filed with the court a Notice about his Prison Conditions (CRDE 1364), a Notice of Filing of Documents Regarding Previous Filings (CRDE 1367), a Notice of Filing Attachment re Motion for Reconsideration (CRDE 1371), a Motion for Reconsideration (CRDE 1372), and a Motion to Dismiss for Lack of Jurisdiction and a follow up Motion for Reconsideration re Order on Motion

---

[3] *See, e.g.*, *United States v. Walls*, 455 F. Supp. 3d 461, 463–64 (E.D. Mich. 2020) (finding court lacked jurisdiction over motion for compassionate release because the requested relief involved a matter related to the defendant's appeal of an order denying modification of the sentence); *United States v. Campbell*, -- F. Supp. 3d --, 2020 WL 1958486, at *2 (W.D.N.Y. Apr. 21, 2020) ("Defendant is seeking a substantive modification to his sentence, and this Court lacks the jurisdiction to grant this relief because of [d]efendant's pending appeal." (alteration added)).

to Reduce Sentence (CRDE 1380). The government filed a response in opposition to these various motions (CRDE 1382). The court agreed with the government that the defendant's motions for reconsideration could not be considered and granted the government's motion to dismiss and denied the related motions (CRDE 1384). In her order the court stated that:

> "As both parties note, Defendant has filed and continues to file both directly as a *pro se* Defendant, as well as through his counsel, the Federal Public Defender. This must come to an end. Defense counsel's careful and detailed efforts (requiring more than five pages in the Response, see DE 1382 at 2-7) to keep the Court and parties on the same page regarding Defendant's filings exemplify the problems created by multiple filers. Defendant has multiple arguments seeking relief on multiple bases, and the Court seeks to examine each thoroughly and carefully. Receiving filings on the same or related matters by both the Defendant directly and by defense counsel disrupts the Court's task. Moreover, this situation leads to inefficiencies, which could delay justice for Defendant, as well as the for the other defendants before this Court."

The court advised that defendant's counsel had until March 15, 2021 to review the defendant's multiple *pro se* pleadings for any additional and different compassionate relief claims opined by the defendant and to advise the court by March 15, 2021 should any additional claims exist (CRDE 1384). On February 2, 2021, the defendant filed another Notice of Appeal regarding the court's denial of his Motion for Reconsideration and Order of Dismissal for Lack of Jurisdiction (CRDE 1388). The defendant filed an additional pleading (CRDE 1392). On March 12, 2021, this court entered an order striking the defendant's *pro se* pleading (CRDE 1393). Thereafter, counsel filed the instant supplemental motion for compassionate release (CRDE 1394).

In this latest pleading, the Defendant maintains that his medical condition, and the threat of the COVID-19 pandemic qualify as extraordinary and compelling. The defendant contends that that these factors coupled with his alleged sentencing disparity or his alleged sentencing disparity alone warrant compassionate release. He alleges as "new" that the court can consider the sentencing disparity separately as a basis for compassionate release. The defendant has alleged a sentencing disparity before however, and his allegations do not warrant relief. Further, he has

appeals pending with the Eleventh Circuit Court of Appeals, and as the court has ruled previously, it lacks the jurisdiction to consider the supplemental motion.

## THE BUREAU OF PRISONS' RESPONSE TO THE COVID-19 PANDEMIC

As this Court is aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period and that has resulted in massive disruption to our society and economy. In response to the pandemic, the Bureau of Prisons ("BOP") has taken significant measures to protect the health of the inmates in its charge.

The BOP has explained that "maintaining safety and security of [the BOP's] institutions is [the BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, the BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, the BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts at the Centers for Disease Control ("CDC"), including by reviewing guidance from the World Health Organization. On March 13, 2020, the BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to

minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, the BOP has repeatedly revised the Action Plan to address the crisis.

The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, the BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training. All staff and inmates have been and will continue to be issued facemasks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms.

Social and legal visits were stopped on March 13th in order to limit the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, the BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. Further details and updates of the BOP's modified operations

are available to the public on the BOP's website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, the BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the BOP, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance the BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, the BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516. On April 3, 2020, the Attorney General gave the Director of the BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, at https://www.bop.gov/coronavirus/. Taken together, all these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. The BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. However, the BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, the BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time when interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time when Probation has necessarily cut back on home visits and supervision).

## DEFENDANT'S INSTANT MOTION FOR COMPASSIONATE RELEASE

The defendant contends that the court should show compassion because he is serving four life sentences (plus a consecutive fifteen years). He suggests his sentence is inequitable because of changes in the law and that this is an additional basis from which the court can grant compassionate release. This claim, however, as discussed below, was raised previously in his May 11, 2020 motion for modification of sentence for extraordinary and compelling reasons (CRDE 1329). Moreover, as discussed below, an alleged sentencing inequity is not an appropriate basis for the court to grant compassionate release. With regards to his medical ailments, as the court noted in her November 2020 order denying compassionate release, the defendant has been able to adequately self-care during his imprisonment.[4] Although not mentioned in the court's order, in

---

[4] His medical records are voluminous. His records for the past year reflect a general

October 2020, the defendant became infected with COVID-19. In his initial infection period, the defendant exhibited a slight fever and chills, but these symptoms dissipated. His medical records reflect that he reported no further symptoms such as loss of smell or taste, shortness of breath during the remainder of his infection. Thus, he weathered his COVID-19 infection without hospitalization or any quantifiable distress. In sum, the defendant has caught and recovered from COVID, has been able to manage his overall care, and has no recognizable basis that qualifies as extraordinary and compelling. Accordingly, the defendant's motion should be denied.

## LEGAL STANDARD AND ANALYSIS

Saldana contends that the district court abused its discretion as a matter of law by treating USSG § 1B1.13 as binding. But adhering to the criteria in USSG § 1B1.13 accords with the law. In Dillon v. United States, 560 U.S. 817 (2010), the Supreme Court held that, where 18 U.S.C. § 3582(c)(2) authorized a sentence reduction contingent on any reduction being consistent with the Sentencing Commission Policy Statements, the Commission's policy statements were binding.

The defendant relies on the flawed reasoning of several other circuit court decisions, which have held that USSG § 1B1.13 is not binding because it is not an "applicable" policy statement for prisoner-filed early release motions. USSG 1B1.13 is the only policy statement that addresses how to apply this statute. Indeed, its title is "Reduction in Term of Imprisonment Under 18 U.S.C.§ 3582(c)(1)(A)."  Pursuant to § 994(t), Congress delegated the precise definition of "extraordinary

---

defiance of medical recommendations and physical therapy sessions.  He does not report regularly to his sessions, nor does he follow an exercise program recommended by those treating him.  His medical records contain multiple notes that he does not follow the staff's directives; as recently as March 8, 2021, his records reflect a comment that the defendant gains 3-4 kilograms between sessions. Whether his defiance is intended to exacerbate his medical conditions for purposes of hoping to secure relief or not, there exists a clear unwillingness to do what he can to improve his health and overall lifestyle.

and compelling reasons" to the Commission, and USSG § 1B1.13 is the only Guidelines provision that describes that term.

The defendant contends that the statement is outdated because, due to the lack of a quorum, the Sentencing Commission has been unable to modify USSG § 1B1.13 since the passage of the First Step Act. It is true that the Commission fashioned the current version, which references acts taken by the BOP, at a time when the BOP had the exclusive authority to bring § 3582(c)(1)(A) motions. The First Step Act altered the statutory scheme to enable prisoners to bring these motions on their own behalf if the BOP declined to do so. Yet the First Step Act left unchanged the gateway criteria for eligibility— "extraordinary and compelling reasons"—and did not alter § 994(t), which left the definition of that term to the Commission. At a minimum, the substantive portion of USSG § 1B1.13 that defines "extraordinary and compelling reasons" remains binding on courts when applying § 3582(c)(1)(A). Under USSG § 1B1.13, the defendant has not presented an extraordinary or compelling reason for granting relief and his position that his sentence would be different today does not qualify.

Since the defendant is ineligible for retroactive relief of amendments passed by the United States Sentencing Commission lowering the base offense levels for drug offenses in general and crack cocaine offenses because of his mandatory life sentences, and cannot obtain relief under amendment 403 for his 924(c) convictions, he now tries to avail himself of the only mechanism that he can argue to receive an early release date.[5] The alleged sentencing disparity he complains

---

[5] *See* CRDE 832:2 ("Defendant is not eligible for the relief provided by the retroactive application of the amendment [706], because he would still be bound by the statutorily required sentence of life imprisonment."). Also, Congress did not make the FSA's §403(a) retroactive. The statute's language clearly says the section only applies to offenses committed before the First Step Act's passage "if a sentence for the offense has not been imposed as of such date of enactment." Pub. L. No. 115-391, 132 Stat. 5194, 5122.

of, however, is mandated by the law. Thus, no disparity exists simply because some of his co-defendants' sentences were reduced as a result of these amendments. His attempts to circumvent the policy statements of the Sentencing Guidelines and § 3582 must fail.

Regarding his health, there is nothing new to revisit regarding this issue with the exception that the defendant weathered his infection successfully and with little impact. The defendant's records indicate that during his infection, his vital signs remained stable and within normal limits. During his visits with medical staff, the defendant reported no symptoms or distress, and his records do not suggest he has suffered from any lingering effects.[6]

Further, even if the court had concluded that the defendant's medical condition qualified as extraordinary and compelling, the defendant's charged conduct as well as his extensive history of being involved in criminal conduct, in and of itself, present a danger to the community. Pursuant to 18 U.S.C. § 3582(c)(1)(A) and to the applicable policy statements issued by the Sentencing Commission, his argument must fail *See* U.S.S.G. § 1B1.13.[7] Although not all the arrests are for significant criminal conduct, the relevant theme is that since his teens, the defendant continued to inject himself into situations involving criminal conduct and is a danger to the community.[8]

His conduct in the instant case is particularly concerning and although summarized above, his conduct is worth highlighting and repeating. The defendant was the head of a violent cocaine

---

[6] As a sidenote, several cases contradict the idea that the defendant is more vulnerable to a second infection or that he will experience more serious illness should he be infected a second time. See *United States v. Wieman*, 2021 WL 425113 (D. S.D. February 8. 2021); *United States v. Carter*, 2021 WL 427110 (E.D. Penn. February 8, 2021); *United States v. Cummings*, 2021 WL 354957 (S.D. N.Y. February 2, 2021).

[7] Under this policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2).

[8] *See* footnote 2 for a list of defendant's extensive arrests and convictions.

distribution network that for many years operated out of Miami in an area known as the Design District (PSI ¶ 12). The organization sold multi-kilograms of crack cocaine, averaging two to five kilograms weekly, primarily through a barred room in Saldana's house in the area (PSI ¶¶ 12, 15). Much of the cocaine they sold was processed by the organization into crack (PSI ¶ 14). The defendant or one of his brothers would lock workers inside the room for long shifts, armed with a firearm and cocaine to sell, to protect themselves and the cocaine (PSI ¶ 12). The defendant himself was violent and so were his workers; he instructed them to shoot anyone who tried to "rip them off" (*id.*).[9] Saldana himself sold crack cocaine to undercover officers during the conspiracy (PSI ¶ 15). During the conspiracy, numerous search warrants were executed at the main drug house, resulting in the seizure of at least twenty firearms and varying amounts of cocaine (PSI ¶ 13). Often, agents found workers flushing cocaine down the toilets when they executed the search warrants. By his own admission, the defendant bought powder and crack cocaine to sell out of his house (PSI ¶ 31). He estimated that he bought at least 100 quarter kilograms of cocaine from one of his distributors during the conspiracy and admitted to having other suppliers as well (PSI ¶ 32). He also admitted personally buying three of the many firearms seized (*id.*). While his prior arrests and convictions may have resulted in lenient punishments and numerous dismissals, this in no way reflects the level and seriousness of criminal conduct that the defendant participated in prior to his arrest in this case. And while he has had only minor disciplinary infractions while incarcerated, his criminal record and complete disregard for the law qualify the defendant as a danger to the community.

---

[9] In January 1989, during the charged conduct, a worker shot and killed a customer who was caught in gun crossfire when a rival gang tried unsuccessfully to steal cocaine.

## CONCLUSION

For the forgoing reasons, the defendant's Supplemental Memorandum of Law and Motion for Compassionate Release should be denied.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

BY: *s/ E.J. Yera*
E.J. YERA
ASSISTANT UNITED STATES ATTORNEY
COURT I.D. A5500337
500 South Australian Ave., Suite 400
West Palm Beach FL  33401
Tel. (561) 209-1052
Fax (561) 820-8777
e.j.yera@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 29, 2021, I filed the foregoing document with the Clerk of the Court using CM/ECF.

BY: *s/ Evelio Jesús Yera*
EVELIO JESUS YERA
ASSISTANT UNITED STATES ATTORNEY
COURT I.D. A5500337
500 South Australian Ave., Suite 400
West Palm Beach FL  33401
Tel. (561) 209-1052
Fax (561) 820-8777
e.j.yera@usdoj.gov